**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

ROBIN WILKERSON,

            Plaintiff,

            vs.

CENTERS PLAN FOR HEALTHY LIVING LLC.,

            Defendant.

Civil Action No. 20-cv-5478

**COMPLAINT**

**JURY TRIAL DEMANDED**

1.      Plaintiff Robin Wilkerson, by and through her attorneys, The Law Office of Christopher Q. Davis, PLLC, alleges upon personal knowledge and information and belief, as follows:

## PRELIMINARY STATEMENT

2.      Plaintiff Robin Wilkerson ("Ms. Wilkerson" or "Plaintiff") brings this action against Defendant Centers Plan for Healthy Living, LLC ("CPHL" or "Defendant") for monetary and emotional damages suffered as a result of violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*. ("FLSA"), the New York Labor Law §§ 190 *et seq*.("NYLL"), and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA").[1] In addition, Ms. Wilkerson brings disability discrimination claims under the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL").

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and

---

[1]    Plaintiff also intends to bring claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAA"). For these violations Ms. Wilkerson will be filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and will file and Amended Complaint following receipt of a Notice of Right to Sue.

supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.[2]

4.      In addition, the Court has jurisdiction over Plaintiff's claims under the FLSA pursuant to 29 U.S.C. § 207 *et seq.*

5.      This Court has jurisdiction over Plaintiff's claims under the FMLA pursuant to 29 U.S.C. § 2601 *et seq*.

6.      Venue is proper in the United States District Court, Eastern District of New York pursuant to 28 U.S.C. § 1391, because the wage violations which give rise to Plaintiff's claims occurred in this district.

## PARTIES

7.      Plaintiff resides in the state of New York.

8.      Plaintiff's current address is 123 Winter Lane, Hicksville, NY 11801.

9.      From July 16, 2018 to September 30, 2020, Defendant employed Ms. Wilkerson as a CDPAS Intake Coordinator.  In this role, Ms. Wilkerson assisted with administrative tasks and coordinated patient care and home care services.

10.     Defendant Centers Plan for Healthy Living maintains a principle place of business at 75 Vanderbilt Ave, Staten Island, NY 10304. Plaintiff worked at Defendant's office located at 465 Smith St, Farmingdale, NY 11735.

## FACTUAL STATEMENT

11.     In or around July of 2018, Ms. Wilkerson was hired by Defendant as an Intake Coordinator.  She worked in the consumer directed personal assistance services department

---

[2]      This Court will have jurisdiction over Plaintiff's claims under the ADA, when they are filed, pursuant to 42 U.S.C. § 12101 *et seq.*

(hereinafter "CDPAS") and assisted with administrative and patient care coordination regarding the provision of home care services by a friend or family member.

**Ms. Wilkerson Works Overtime Without Compensation.**

12.    Ms. Wilkerson earned $19.87 an hour.

13.    Ms. Wilkerson's regular schedule was Monday through Friday from 8am-4pm.

14.    Ms. Wilkerson's duties and responsibilities included, but were not limited to, (1) helping patients register for home care services, (2) managing over 100 cases to ensure staff members were complying with the Department of Health regulations, (3) reviewing patient cases every six months to ensure continued Medicaid coverage, (4) assisting with special projects, and (5) updating a case-management spreadsheet weekly.

15.    From June 2020 to September 2020, Ms. Wilkerson's job responsibilities increased, which required her to work more than 40 hours per week without overtime compensation.

16.    Specifically, in addition to her previously stated duties, beginning in June 2020, Ms. Wilkerson became the sole person in charge of her department's email box, where she had to review, upload, follow up, and forward various documents to others.

17.    Prior to June 2020, her quota was to send about 20 emails a day; however, once she became the sole person responsible for her department's email box, the quota became about 150 emails, on top of all of her other regular duties.

18.    Additionally, because of Covid-19, CPHL was incredibly busy because clients needed to drop off medical forms and documents, which Ms. Wilkerson was responsible for handling, and as such further increased Ms. Wilkerson's workload.

19.    Due to the increase in her workload, Ms. Wilkerson was not always able to

complete all of her work assignments during her regular schedule of Monday to Friday, 8am to 4pm.

20.     Therefore, Ms. Wilkerson informed her supervisor verbally of her need to work overtime.

21.     Specifically, Ms. Wilkerson began staying late and coming in early about three to four times a week, and she also had to work through her lunch break at times so that she could complete all of her assigned tasks.

22.     This resulted in Ms. Wilkerson working more than 40 hours a week, beginning on or around June 2020 through her termination in or about September 2020.

23.     There were multiple weeks between June 2020 and September 2020 where Ms. Wilkerson worked over 40 hours a week without overtime premiums for overtime hours worked.

24.     Specifically, there are weeks where Ms. Wilkerson worked her full 40-hour schedule from Monday to Friday, 8am to 4pm, and also worked additional hours beyond 40 when she arrived as early as 6am at least 2-3 days a week, resulting in 4-6 hours of overtime, sometimes even more, during each such week.

25.     For example, during the weeks of June 29, 2020 and July 6, 2020, Ms. Wilkerson worked more than 40 hours.  During these weeks, in addition to her regularly Monday through Friday 8am-4pm schedule, Ms. Wilkerson arrived as early as 6am at least 2 to 3 days, instead of her scheduled 8am. On these days, Ms. Wilkerson still left at her regular 4pm time because she was not able to complete all of her work earlier. In fact, on Friday July 3, 2020, Ms. Wilkerson's supervisor told everyone that they could leave early for the Fourth of July holiday; however, because of her workload Ms. Wilkerson was not even able to leave early that day.

26.     These additional hours worked during the weeks of June 29, 2020 and July 6, 2020, resulted in Ms. Wilkerson working at least 4-6 hours of overtime during each of these weeks.

27.     Every time Ms. Wilkerson came in early or stayed late, she worked "off-the-clock."

28.     Ms. Wilkerson's supervisor was aware that she was working "off-the-clock" because she had already told him that she had too much work to complete in her regular 40-hour workweek.

29.     Moreover, Ms. Wilkerson's supervisor also received work emails from Ms. Wilkerson before 8am and after 4pm, thus further evidence that he knew, or should have known, that she was working off-the-clock without either straight time and/or overtime compensation.

30.     Although Ms. Wilkerson regularly worked "off-the-clock" overtime hours between June 2020 to September 2020, which Defendant knew about, the Defendant nonetheless did not pay her overtime rate for any hours worked over 40.

**Ms. Wilkerson is Unlawfully Denied FMLA Leave and Discriminated Against Based on Her Disability**.

31.     In or around November of 2019, Ms. Wilkerson needed to take care of her parent and attempted to request time off through the Family and Medical Leave Act (hereinafter "FMLA").

32.     By November of 2019, Ms. Wilkerson had worked for CPHL for more than a year and worked more than 1250 hours; thus, she was an eligible employee under the FMLA.

33.     CPHL has 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding year and therefore is a covered employer under the FMLA.

34.     In or about November 2019, Ms. Wilkerson informed her supervisor that she needed to take leave to care for a sick parent, and her supervisor notified a manager at CPHL.

35.     Ms. Wilkerson then followed up with a human resource ("HR") representative to complete the FMLA request.

36.     Shortly thereafter Defendant provided Ms. Wilkerson the FMLA forms (hereinafter "November 2019 FMLA forms") that she needed to complete in order to take FMLA leave to care for her parent.

37.     However, because she could not get the November 2019 FMLA forms completed in time to complete her request for FMLA, she instead requested 30 days of unpaid personal leave.

38.     Ms. Wilkerson ultimately decided not to use any leave at that time.

39.     Approximately eight months later, on or around Friday, July 31, 2020, Ms. Wilkerson informed a different supervisor that she needed to take time off through FMLA to care for her own serious mental health condition.

40.     Specifically, Ms. Wilkerson was diagnosed with severe depression and anxiety disorder.

41.     Her supervisor told her that before CPHL would provide her any necessary FMLA paperwork to complete, she first needed to provide a note from her doctor about her serious health condition.

42.     Specifically, he told her that a doctor's note would make her request for FMLA look more "legitimate," as if somehow her need for FMLA to care for her own mental health condition was somehow not legitimate.

43.     At her next doctor's appointment, approximately 2 weeks after informing her supervisor of her FMLA request, Ms. Wilkerson asked her doctor for a note so that she would be able to obtain the FMLA forms from CPHL.

44.     Ms. Wilkerson's doctor informed her that there was no requirement under the FMLA that she obtain a doctor's note before her employer even provides her FMLA forms to complete.

45.     As such, upon returning to work, Ms. Wilkerson again asked her supervisor for the FMLA forms.

46.     Ms. Wilkerson's supervisor again inappropriately told her that a prerequisite for even just obtaining FMLA forms was a doctor's note explaining why she needed to take time off.

47.     Based on her supervisor's direction, at her next doctor's appointment Ms. Wilkerson again asked her doctor for a note explaining her need for FMLA leave.  Ms. Wilkerson explained to her doctor that CPHL insisted that they needed a doctor's note before they would provide her the forms necessary for seeking FMLA leave.

48.     Ms. Wilkerson's doctor again told Ms. Wilkerson that it was not standard procedure to require a doctor's note before even providing an employee the necessary forms to complete in order to request FMLA leave.

49.     Nonetheless, Ms. Wilkerson's doctor provided a note.

50.     Additionally, because CPHL would not provide Ms. Wilkerson with new FMLA forms to complete, she and her doctor completed the November 2019 FLMA forms for the purposes of requesting leave to care for her own mental health.

51.     Ms. Wilkerson submitted those forms to CPHL for purposes of requesting leave to care for her own mental health on August 24, 2020.

7

52.     Ms. Wilkerson's doctor noted, in the paperwork submitted on August 24, 2020, that he was referring Ms. Wilkerson to a neurologist and therapist to treat her mental health condition.

53.      Ms. Wilkerson's doctor further explained that her symptoms included, but were not limited to, frequent headaches, insomnia, anxiety, stress, difficulty with concentration and focus, and excessive fatigue. Her doctor then explained what care was needed and why it was medically necessary.

54.     Shortly after submitting the above mentioned FMLA forms, a representative from HR sent Ms. Wilkerson an email stating that the FMLA forms she submitted on August 24, 2020 were for leave to care for a family member, not leave to care for oneself.

55.     As such, the HR representative told Ms. Wilkerson that CPHL were not accepting the FMLA forms she submitted on August 24, 2020 and that she would need to re-submit her request for FMLA leave using forms specifically for leave to care for oneself.

56.     Additionally, the HR representative told Ms. Wilkerson that in order to take FMLA leave without 30-day notice CPHL required a letter from her physician stating why she needed to take immediate leave.

57.     This was the first time Ms. Wilkerson was told she needed to provide 30-day notice in order to take FMLA leave, and regardless it had already been nearly 30-days since Ms. Wilkerson had first informed her supervisor, on July 31, 2020, that she was requesting FMLA leave to care for her own mental health condition.

58.     Nonetheless, Ms. Wilkerson followed the HR representative's directives and on or around September 3, 2020, her doctor completed the FMLA forms for personal leave and

provided a note explaining why Ms. Wilkerson needed to take the leave immediately (referred to herein as the "September FMLA forms").

59.    Ms. Wilkerson immediately submitted the new FMLA forms and a doctor's note to HR.

60.    Ms. Wilkerson's doctor specified in his note that he was treating Ms. Wilkerson for severe anxiety and depression. The doctor's note went on to explain that in his medical opinion it was in Ms. Wilkerson's best medical interest to take an immediate leave from work to more aggressively treat and monitor her symptoms.

61.    In the September FMLA Forms, Ms. Wilkerson's doctor again noted that the symptoms of Ms. Wilkerson's severe depression and anxiety disorder included, but were not limited to, frequent headaches, insomnia, anxiety, stress, difficulty with concentration and focus, and excessive fatigue. Her doctor then explained what care was needed and why it was medically necessary.

62.    The following day, on or around September 4, 2020, a HR representative told Ms. Wilkerson that they needed more information in order to approve her FMLA leave.

63.    Specifically, the HR representative from CPHL told Ms. Wilkerson that before they would approve her FMLA request she needed to have her treating physician provide CPHL with a detailed treatment schedule and the plan for "aggressive treatment" of Ms. Wilkerson's condition.

64.    Additionally, the HR representative told Ms. Wilkerson that her doctor needed to include a specific explanation of how her medical situation became emergent without prior warning or advanced notice.

65.     Ms. Wilkerson's medical situation had not suddenly become emergent without prior warring; in fact, Ms. Wilkerson had first communicated to her supervisor her need to take leave 35 days prior, on or about July 31, 2020.

66.     On or around September 8, 2020, Ms. Wilkerson again followed up with HR to see if her FMLA forms could be processed since it had now been 15 days since she submitted the forms (which was August 24, 2020).

67.     An HR representative again claimed that they needed more information and that a formal determination regarding Ms. Wilkerson's request for FMLA leave could not be made until that additional information was received.

68.     The HR representative then told Ms. Wilkerson that if she was not able to work prior to CPHL's decision regarding her FMLA leave request, then she could take "appropriate measures," and call out sick.

69.     On or around September 14, 2020, Ms. Wilkerson emailed HR telling them that she was going to her doctor again and asked for clarity on what exactly they needed from her doctor that she has not already provided.

70.     That same day, HR stated that, "as the FMLA forms stand now, the information provided does not support FMLA leave and at times is contradictory. If the doctor can provide detailed clarification to treatment schedule, [they] can review again. Otherwise, [they] will not be able to approve."

71.     Despite claiming that the FMLA forms were "contradictory," CPHL never identified anything specific that was "contradictory," nor did they say why the original treatment schedule that was already provided needed clarifying.

72.     That same day, September 14, 2020, Ms. Wilkerson returned to her doctor and asked him to correct her FMLA forms pursuant to CPHL's requests so that she could begin her FMLA leave, particularly since her mental health condition was deteriorating and becoming more exacerbated by CPHL conduct in interfering with her FMLA rights.

73.      Ms. Wilkerson's doctor stated that the treatment plan was already written on the September FMLA forms that were submitted on or about September 3, 2020 and that he did not know what else CPHL needed.

74.     Ms. Wilkerson attempted to call HR while she was with her doctor so that HR could be more specific with her doctor as to what additional information was needed; however, she was unable to get anyone from HR on the phone.

75.     On or around September 17, 2020, Ms. Wilkerson again followed up by emailing HR seeking clarification on what information CPHL felt was contradictory or absent from her existing treatment plan that was set forth in her September FMLA forms.

76.     On or around September 22, 2020, HR told Ms. Wilkerson that "there were items that were unclear and at times contradictory in Form WH-380-E, specifically items 3, 4, and item 6."

77.     The HR representative also said that if Ms. Wilkerson's doctor was not able to give CPHL a detailed clarification that Ms. Wilkerson could just got to another physician.

78.     Again, the HR representative was not specific as to why the answers to questions 3, 4, and 6 – which essentially ask for a description of medical facts related to the condition for which the employee seeks leave, the nature of treatment, and estimate as to the duration – were contradictory.

79.     It was clear at this point that CPHL was interfering with Ms. Wilkerson's FMLA rights to take leave to care for a serious mental health condition – which includes, for example, major depression or severe anxiety.

80.     After having her FMLA rights being interfered with, and clearly being discriminated against by being denied a reasonable accommodation (a short leave of absence) for her disability, Ms. Wilkerson looked into her FMLA rights.

81.     Ms. Wilkerson found information on her FMLA rights and based on such research she sent a letter to HR, on or around September 22, 2020, objecting to CPHL's decision to deny her FMLA leave, making clear they were interfering with her rights under the FMLA, and stating that she believed she was being discriminated against due to her disability.

82.      At the bottom of the letter, Ms. Wilkerson put her contact information and said it was medically required for her to take leave under her doctor's supervision starting on or about September 28, 2020 – 1 month and 28 days after her first request for FMLA leave.

83.     On or around September 28, 2020, Ms. Wilkerson began attending medically necessary treatments and did not report to work.

84.     On September 30, 2020, Ms. Wilkerson received a phone call from HR terminating her employment with CPHL.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Failure to Pay Overtime Compensation in Violation of the FLSA)

85.     Ms. Wilkerson repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

86.     From June 2020 to September 2020, Ms. Wilkerson regularly worked in excess of forty (40) hours per week.

87.     At all relevant times, Ms. Wilkerson was an employee and CPHL has been an

employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

88.     At all relevant times, CPHL engaged in commerce or in an industry or activity affecting commerce.

89.     CPHL knowingly and intentionally failed to pay Ms. Wilkerson overtime at the rate of one and one-half times her regular rate of pay for each hour worked in excess of forty (40) hours per week in violation of 29 U.S.C. § 201 *et seq.*

90.     By failing to accurately record, report, and/or preserve records of hours worked by Ms. Wilkerson, CPHL has failed to make, keep, and preserve records with respect to Ms. Wilkerson sufficient to determine her wages, hours, and other conditions and practices of employment, in violation of the FLSA, 29 U.S.C. § 201, *et seq.*

91.     The foregoing conduct, as alleged, constitutes a willful violation of the FLSA, within the meaning of 29 U.S.C §§ 216(b) and 255(a), and such other legal and equitable relief as the Court deems just and proper.

92.     Due to CPHL's FLSA violations, Ms. Wilkerson is entitled to recover from CPHL damages in the amount of unpaid overtime compensation, liquidated damages, attorneys' fees and costs, and interest.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Failure to Pay Overtime in Violation of the NYLL)**

93.     Ms. Wilkerson repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

94.     June 2020 to September 2020, Ms. Wilkerson regularly worked in excess of forty (40) hours per week.

95.     At all relevant times, Ms. Wilkerson was an employee and CPHL has been an employer within the meaning of the NYLL.

96.     CPHL knowingly and intentionally failed to pay Ms. Wilkerson overtime at a rate of one and one-half times their regular rate for each hour worked in excess of forty (40) hours per week in violation of New York Labor Law Article 19, §§ 650 *et seq.* and the supporting regulation of the New York State Department of Labor.

97.     CPHL's failure to pay Ms. Wilkerson's overtime premiums was willful within the meaning of the N.Y. Lab. Law § 663.

98.     Due to CPHL's NYLL violations, Ms. Wilkerson is entitled to recover from CPHL damages in the amount of unpaid overtime compensation, liquidated damages, attorneys' fees and costs, and interest.

<u>**AS AND FOR A THIRD CAUSE OF ACTION**</u>
**(Failure to Furnish Accurate Wage Statements in Violation of NYLL §195(3))**

99.     Plaintiff repeat and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

100.    At all relevant times, Plaintiff was an employee and the Defendant has been an employer within the meaning of the NYLL.

101.    The recordkeeping provisions of Article 19 of the NYLL and its supporting regulations apply to Defendant.

102.    Defendant did not provide Plaintiff with a legally sufficient wage statement upon the payment of wages, as required by NYLL § 195(3).

103.    NYLL §195(3) requires that employers furnish employees with wage statements containing accurate, specifically enumerated criteria required under the NYLL.

104.    As a result of Defendant's unlawful conduct, Plaintiff is entitled to an award of damages pursuant to NYLL § 198, in an amount to be determined at trial, pre- and post-judgment interest, costs and attorneys' fees, as provided by NYLL § 663. *See Copper v. Cavalry Staffing,*

14

*LLC*, 132 F.Supp.3d 460, 466 (E.D.N.Y. 2015) (denying motion to dismiss and holding that "[t]he plain language of § 195(3) requires wage statements furnished to employees to include a statement of 'the number of overtime hours *worked'… [and thus,]* the 'number of overtime hours' that appears on the wage statement should include every hour actually 'worked' by the employee.) (emphasis in original).

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Interference with FMLA Leave in Violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"))

105.    Ms. Wilkerson hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

106.    Ms. Wilkerson was an "employee" within the meaning of the FMLA.

107.    CPHL was Ms. Wilkerson's "employer" within the meaning of the FMLA.

108.    Ms. Wilkerson is, and has been at all relevant times, a qualifying individual who was entitled to FMLA leave.

109.    CPHL is, and has at all relevant times, been a covered employer under the FMLA.

110.    Ms. Wilkerson gave her employer notice of her intention to take FMLA leave on July 31, 2020 – about a month before her proposed leave date.

111.    CPHL then took multiple adverse actions that interfered with Ms. Wilkerson's right to take FMLA leave, including but not limited to, failing to provide her necessary forms to complete, inappropriately rejecting her doctor's notes, and claiming contradictions in Ms. Wilkerson's paperwork that did not exist.

112.    These adverse actions were directly related to Ms. Wilkerson's exercise and attempted exercise of her rights under the FMLA.

113.    CPHL denied Ms. Wilkerson permission to take leave.

15

114.     Refusal to authorize an employee's FMLA leave is an interference with FMLA rights. *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004).

115.     By the actions described above, CPHL, by and through its employees and/or agents, interfered with Ms. Wilkerson's right to FMLA leave and denied her benefits to which she was entitled under the FMLA.[3]

116.     As a direct result of CPHL's actions, Ms. Wilkerson has suffered and continues to suffer harm for which she is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Retaliation for taking FMLA Leave in Violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"))

117.     Ms. Wilkerson hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

118.     Ms. Wilkerson was an "employee" within the meaning of the FMLA.

119.     CPHL was Ms. Wilkerson's "employer" within the meaning of the FMLA.

120.     Ms. Wilkerson is, and has been at all relevant times, a qualifying individual who was entitled to FMLA leave.

121.     CPHL is, and has at all relevant times, been a covered employer under the FMLA.

122.     From July 31, 2020 to the date of her termination, Ms. Wilkerson continued to engage in protected activity when she attempted to exercise her right to take personal medical leave for which she was qualified under the FMLA and when she begin her FMLA leave on or about September 28, 2020.

---

[3] WAGE AND HOUR DIVISION, U.S. DEPT. OF LABOR, *The Employer's Guide to The Family and Medical Leave Act* 71, https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/employerguide.pdf (last visited Oct. 16, 2020).

123.    On September 30, 2020, CPHL terminated Ms. Wilkerson for taking FMLA leave for which she was entitled, which any reasonable employee would find materially adverse.

124.    The temporal proximity between Ms. Wilkerson taking her FMLA leave and her termination – only 2 short days – clearly creates a causal connection between the protected activity and the adverse action.

125.    CPHL's decision to terminate Ms. Wilkerson for requesting and taking temporary medical leave for the treatment of her severe anxiety and depression amounts to a retaliation against her for invoking her protected rights under the FMLA.

126.    As a direct result of CPHL's actions, Ms. Wilkerson has suffered and continues to suffer harm for which she is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Discrimination in Violation of the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL"))

127.    Ms. Wilkerson hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

128.    Ms. Wilkerson was an "employee" within the meaning of the NYSHRL.

129.    CPHL was Ms. Wilkerson's "employer" within the meaning of the NYSHRL.

130.    Ms. Wilkerson is, and has been at all relevant times, a qualified individual with a disability and a record of a disability within the meaning of the NYSHRL.

131.    Ms. Wilkerson is, and has been at all relevant times, otherwise qualified for her position with CPHL; she was, and is, able to perform the essential functions of the position with a reasonable accommodation.

132.     Requesting a temporally defined leave of absence can be a recognized reasonable accommodation.  *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184-86 (2nd Cir., 2006) (holding that the requested leave of absence would have been unreasonable *only* if it was for an indefinite period); *Dansler-Hill v. Rochester Inst. of Tech.*, 764 F. Supp. 2d 577, 583 (W.D.N.Y. 2011) ("…a temporally-defined leave of absence may constitute a reasonable accommodation"); *Stamey v. NYP Holdings, Inc.,* 358 F.Supp.2d 317, 325 (S.D.N.Y. 2005) ("We note that courts considering this question have concluded that a leave of absence may be a reasonable accommodation where it is finite and will be reasonably likely to enable the employee to return to work."); *Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174, 181 (2d Cir. 2016) (extending the analysis of accommodations under the ADA to the NYSHRL).

133.     CPHL's decision to terminate Ms. Wilkerson for requesting and taking temporary medical leave for the treatment of her severe anxiety and depression amounts to discriminatory adverse action motivated by Ms. Wilkerson's disability.

134.     CPHL knew of Ms. Wilkerson's disability but nevertheless committed acts of disparate treatment based on discriminatory motive by terminating her.

135.     By the actions described above, CPHL, by and through its employees and/or agents, subjected Ms. Wilkerson to discrimination in violation of the NYSHRL.

136.     As a direct result of CPHL's actions, Ms. Wilkerson has suffered and continues to suffer harm for which she is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

**<u>AS AND FOR A SEVENTH CAUSE OF ACTION</u>**
**(Failure to Provide Reasonable Accommodation in Violation of the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL"))**

137.     Ms. Wilkerson hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

138.     Ms. Wilkerson was an "employee" within the meaning of the NYSHRL.

139.     CPHL was Ms. Wilkerson's "employer" within the meaning of the NYSHRL.

140.     Ms. Wilkerson is, and has been at all relevant times, a qualified individual with a disability and a record of a disability within the meaning of the NYSHRL.

141.     Ms. Wilkerson is, and has been at all relevant times, otherwise qualified for her position with CPHL; she was, and is, able to perform the essential functions of the position with a reasonable accommodation.

142.     Even if Ms. Wilkerson was not qualified under the FMLA, requesting a temporally-defined leave of absence is a recognized reasonable accommodation.  *See Graves v. Finch Pruyn & Co*., 457 F.3d 181, 184-86 (2nd Cir., 2006) (holding that the requested leave of absence would have only been unreasonable if it was indefinite); *Dansler-Hill v. Rochester Inst. of Tech*., 764 F. Supp. 2d 577, 583 (W.D.N.Y. 2011) ("…a temporally-defined leave of absence may constitute a reasonable accommodation…"); *Stamey v. NYP Holdings, Inc.,* 358 F.Supp.2d 317, 325 (S.D.N.Y. 2005) ("We note that courts considering this question have concluded that a leave of absence may be a reasonable accommodation where it is finite and will be reasonably likely to enable the employee to return to work."); *Vangas v. Montefiore Med. Ctr*., 823 F.3d 174, 181 (2d Cir. 2016) (extending the analysis of accommodations under the ADA to the NYSHRL).

143.     Ms. Wilkerson sought a reasonable accommodation for her disability by requesting time off from not only her supervisor but also directly from HR, and she did so at about a month before her proposed leave date.

19

144.    Allowing Ms. Wilkerson to take her medical leave would not have been an undue

burden on CPHL.  The dates of Ms. Wilkerson's leave were clearly defined in her treatment

plan, and CPHL would not have been expected to keep the position open indefinitely.

145.    CPHL knew of Ms. Wilkerson's disability but nevertheless committed acts of

disparate treatment based on discriminatory motive by terminating her.

146.    By the actions described above, CPHL, by and through its employees and/or

agents, subjected Ms. Wilkerson to discrimination in violation of the NYSHRL.

147.    As a direct result of CPHL's actions, Ms. Wilkerson has suffered and continues to

suffer harm for which she is entitled to an award of damages, including monetary damages,

compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or

fines.

## AS AND FOR A EIGHTH CAUSE OF ACTION
**(Failure to Engage in the Interactive Process and Retaliation for Requesting a Reasonable Accommodation in Violation of the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL"))**

148.    Ms. Wilkerson hereby repeats and re-alleges each and every one of the above

allegations as if fully set forth herein.

149.    Ms. Wilkerson was an "employee" within the meaning of the NYSHRL.

150.    CPHL was Ms. Wilkerson's "employer" within the meaning of the NYSHRL.

151.    Ms. Wilkerson is, and has been at all relevant times, a qualified individual with a

disability and a record of a disability within the meaning of the NYSHRL.

152.    Ms. Wilkerson is, and has been at all relevant times, otherwise qualified for her

position with CPHL; she was, and is, able to perform the essential functions of the position with

a reasonable accommodation.

153.    Even if Ms. Wilkerson was not qualified under the FMLA, requesting a

temporally-defined leave of absence can be a recognized reasonable accommodation.  *See Graves v. Finch Pruyn & Co*., 457 F.3d 181, 184-86 (2nd Cir., 2006) (holding that the requested leave of absence would have been unreasonable if it was indefinite); *Dansler-Hill v. Rochester Inst. of Tech*., 764 F. Supp. 2d 577, 583 (W.D.N.Y. 2011) ("…a temporally-defined leave of absence may constitute a reasonable accommodation…"); *Stamey v. NYP Holdings, Inc.,* 358 F.Supp.2d 317, 325 (S.D.N.Y. 2005) ("We note that courts considering this question have concluded that a leave of absence may be a reasonable accommodation where it is finite and will be reasonably likely to enable the employee to return to work."); *Vangas v. Montefiore Med. Ctr*., 823 F.3d 174, 181 (2d Cir. 2016) (extending the analysis of accommodations under the ADA to the NYSHRL).

154.    Under the NYSHRL, once an employee submits a request to be accommodated, an employer is required to work with an employee to determine an effective accommodation. *Noll v. Int'l Bus. Machines Corp*., 787 F.3d 89, 94 (2d Cir. 2015).

155.    CPHL failed to engage in the interactive process with Ms. Wilkerson to determine a reasonable accommodation.  In fact, CPHL purposefully gave Ms. Wilkerson confusing information on what was required to obtain a leave of absence; where she could obtain the FMLA forms; what was required to obtain the forms; and CPHL made no attempts to discuss her plans for leave with her. Instead, CPHL flat-out denied her request for leave as being "untimely" and for having "conflicting statements," without ever explaining to Ms. Wilkerson *or her doctor* what else was needed to grant her accommodation.

156.    Ultimately, Ms. Wilkerson was fired specifically for taking a medically necessary leave of absence.

157.    CPHL utterly failed to engage in the interactive process required of them to determine a reasonable accommodation for Ms. Wilkerson's disability.

158.    By the acts described above, CPHL, by and through its employees and/or agents, failed to engage in the interactive process and retaliated against Ms. Wilkerson for requesting an accommodation in violation of the NYSHRL.

159.    As a direct result of CPHL's actions, Ms. Wilkerson has suffered and continues to suffer harm for which she is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgement and issue:

(a) That Defendant is found to have violated the provisions of the New York Labor Law as to Plaintiff;

(b) That Defendant is found to have violated the Fair Labor Standards Act as to Plaintiff;

(c) That Defendant's violations as described about are found to be willfull;

(d) An award to Plaintiff for unpaid wages owed, including interest thereon, and penalties, including liquidated damages, subject to proof at trial;

(e) That Defendant further be enjoined to cease and desist from unlawful activities in violation of the FLSA and NYLL;

(f) An award to Plaintiff for her actual damages in an amount to be determined at trial for lost wages and benefits, including an award of back pay and front pay, based on Defendant's violations of the NYSHRL and FMLA;

(g) An award to Plaintiff of compensatory damages in an amount to be determined at trial for the emotional distress sustained as a result of Defendant's violations of the NYSHRL and FMLA;

(h) An award of punitive damages to deter future conduct by the Defendant, in an amount to be determined at trial;

(i) An award to Plaintiff of the costs of this action, including reasonable attorneys' fees and case expenses to the fullest extent permitted by law, including but not limited to the NYLL, FLSA, NYSHRL and FMLA;

(j) Statutory fines and interest;

(k) Such other and further relief, in law or equity, as the Court deems necessary and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated: November 11, 2020                                    Respectfully submitted,
New York, New York

                                        ____/s/_____
                                        Christopher Q. Davis, Esq.
                                        Rachel M. Haskell, Esq.
                                        The Law Office of Christopher Q. Davis, PLLC
                                        80 Broad St, Suite 703
                                        New York, New York 10004
                                        646-430-7930 (main)
                                        cdavis@workingsolutionsnyc.com
                                        rhaskell@workingsolutionsnyc.com